ROBERTSON *v.* HULBERT.

1. ASSAULT AND BATTERY—PLEADING—AMENDMENT WITHIN COURT'S
   DISCRETION.

   In an action based upon slander and assault and battery,
   the denial of defendant's motion, made during the trial,
   for leave to amend his plea of not guilty by adding special
   notice of probable cause to believe the acts which he is
   alleged to have charged to plaintiff, and accord and satis-
   faction, *held,* within the court's discretion.

2. SAME—APPEAL AND ERROR.

   The denial of said motion, *held,* to have worked no
   prejudice to defendant, where the court permitted his
   counsel to go fully into the evidence on said subject,
   and submitted the same to the jury as proper for their
   consideration in mitigation of damages.

3. SAME—ACCORD AND SATISFACTION.

   Plaintiff's acceptance of defendant's signed statement ad-
   mitting that his attack was without cause, and his
   apology, with assurance, in answer to his inquiry, that
   plaintiff wanted nothing more, *held,* not to furnish a valid
   consideration for full accord and satisfaction, where de-
   fendant admitted he committed an unprovoked assault.

4. SAME—CONTINUANCE DISCRETIONARY WITH COURT—ABUSE OF
   DISCRETION.

   The granting or denial of a motion for a continuance is
   discretionary with the trial court, and its action may be
   disturbed only in case of a palpable abuse of discretion.

5. SAME—ELEMENTS OF DAMAGES.

   The recognized elements of damages for assault and
   battery are actual physical injury and mental suffering
   or sense of outrage and mortification from the humiliating
   indignity arising from the assault and blow inflicted.

6. SAME—HUMILIATION—EVIDENCE—ADMISSIBILITY.

   It was error to allow plaintiff to testify, without showing
   that it emanated from defendant, that immediately after
   the assault it became generally known, and was to plain-
   tiff a humiliating subject of discussion in the city for

   On right to recover for mental suffering caused by assault
   where no bodily injury is inflicted, see note in 25 L. R. A.
   (N. S.) 976.

several weeks, and also to allow witnesses to testify as to what unnamed persons said and believed about plaintiff as a result of said assault.

7. SAME—DAMAGES—INJURY TO BUSINESS—EVIDENCE—TRIAL—INSTRUCTIONS.

Where there was no proper proof upon which to base damages for injury to plaintiff's business, defendant was entitled to have the jury instructed, as requested, that no such damages could be given.

8. SAME—NERVOUS CONDITION NOT AN ELEMENT OF DAMAGES WHERE NOT CLAIMED.

Where plaintiff's counsel stated, during the trial, that no damages were claimed by reason of any nervous condition, defendant was entitled to have the jury instructed, as requested, to disregard the testimony on that subject and award no damages therefor.

9. SAME—EXCESSIVE VERDICT.

Where the record is convincing that a judgment for $1,000 damages for assault and battery is an excessive award, it will be reversed.

Error to St. Clair; Tappan (Harvey), J. Submitted October 19, 1923. (Docket No. 110.) Decided March 5, 1924.

Case by William A. Robertson against Edward Hulbert for assault and battery. Judgment for plaintiff. Defendant brings error. Reversed.

*Walsh & Walsh* (*Patrick C. O'Sullivan*, of counsel), for appellant.

*Shirley Stewart*, for appellee.

STEERE, J. Plaintiff brought this action in the circuit court of St. Clair county, charging defendant with slandering and committing an assault and battery upon him. His charge of slander was defective both in pleadings and proofs, and was abandoned. He recovered a verdict and judgment of $1,000 against de-

fendant for assault and battery.    The latter admits
having committed an unprovoked assault and battery
upon plaintiff but urges as grounds for reversal that
the verdict was excessive, and over 30 other "assign-
ments of error relied upon," many of which need not
be discussed.    Robertson was a resident of Marine
City where he ran a printing office and published a
weekly paper.    Hulbert was a resident of the village
of Fair Haven, an engineer on a lake boat and
physically much larger than Robertson.    Each gave
his age as 44 years.    Both were married and living
with their families.    Neither they or their families
knew each other before this trouble arose.    The first
knowledge that came to the Robertsons of Hulbert's
existence or frame of mind was his appearance at
plaintiff's home in Marine City a couple of days before
this assault, where he introduced himself to Mrs.
Robertson as a detective from Detroit and solicited
her co-operation in getting proof as to the conduct
of her husband, who he stated had been unduly familiar
with his (Hulbert's) wife.    After learning his mission
she told him he had made a mistake, was after the
wrong party and asked who sent him there.    He re-
plied he was not mistaken and came of his own accord.
Receiving no encouragement in his mission, he said her
husband was "going to be watched for the next two
weeks," and left.    On the afternoon of September
8, 1922, he walked into plaintiff's office pretending to
have a revolver in his side pocket with his hand upon
it, and compelled Robertson to go out into a side
street with him to where his wife was sitting in an
automobile.    Robertson's version of that interview
and subsequent events is in part as follows:

"He had some article in his pocket that he forced
against my ribs.    It felt like a gun.    He was a big
man and he was a stranger to me and I was frightened
to death.    I had neither coat nor hat on and my
sleeves were rolled up.    I weigh 118.    And he said,

or I said 'Who are you' and he said, 'You know me, Robertson, hang up that receiver;' I said 'Can't I finish taking this order?' He said, 'Hang up that receiver immediately' and punched me in the ribs. Well, I was just about as frightened as I could be, and in the meantime I said 'What do you want of me?' He said, 'You come with me.' I said, 'You are a stranger to me, I don't want to go with you, and with a man holding a gun on me, a stranger, and you are leading me some place, I don't know where or what about.' I said, 'Get an officer.' He said, 'Come with me and don't argue this case right here;' well, at that time he had threatened the man that was working with me. * * * He said, 'You don't want any publicity on this.' I said, 'I am not afraid of publicity, it is you.' And he said, 'You shut up and come with me,' he said, 'I am going to ask you some questions.' And he said, 'If you lie it is going to go hard with you.' He said 'I will make it hot for you.' Well, he led me up to this woman in a car. * * * The woman was sitting in an automobile right back of the barn and behind the tight board fence. I never had seen her before. He led me up to her and he said, 'Do you know this woman?' I said, 'I never saw the woman in my life,' and he immediately knocked me down. He struck me, I dodged and he hit me in the neck and I fell and at the same time she reached over and she said, 'Why, Ed., I didn't know that man,' and she reached over and brought him across the car and held him. I didn't try to see how long. I ran as fast as I could run right back to the office. In the meantime my man had got out and notified the officers." * * *

Hulbert denied having a revolver, and described the implement he had in his side pocket as a "hose bib" which he bought in Detroit that morning for use in his home. He testified of the affair as follows:

"I drove with my wife in the automobile and stopped on the back street, and I told her to be seated in the car until I returned and I went to the office of Mr. Robertson and he was telephoning when I went in the door. * * * I stepped up to Mr. Robertson and I said, 'There is a woman outside wants to see you, come on along with me.' And he had the tele-

phone in his hand.    He got rather nervous, he said, 'I don't know you, I am not going with you.'    I said, 'yes, you are going with me,' and he was behind the desk.    We walked out on the main street, whatever you call that, Water street, I believe, and we walked south may be 100 feet to the corner and across a short block to the next street which I believe is Market street.    I had my car parked right there with Mrs. Hulbert sitting in the front seat, on the right-hand side.    Mr. Robertson and I walked up alongside of the car and I put him or stood him so that he faced Mrs. Hulbert and I said, 'Do you know this woman?' He says 'No.'    I said, 'Don't you lie to me you do know her.'    He said, 'I don't,' and I slapped his mouth and he ran.    My wife put her arms around my neck here, and sort of pulled me over against the car.    She said 'Ed., you have made a mistake.'    I then walked around and got in the seat of the car and drove up to get to the good road."    *    *    *

Mrs. Hulbert, who had been married to defendant 25 years and borne him 7 living children, one of them an infant 4 months old, testified that her husband asked her to ride over to Marine City with him on that day.    It was customary for them to go riding when he was at home, and there was nothing in what he said to excite any suspicion that he was jealous of her or there was anything wrong until he returned with Robertson, whom he had never mentioned to her and she did not know, and struck him, when she protested. Her story of the circumstances of the assault are substantially the same as told by her husband, who she also said slapped Robertson but did not knock him down.

Hulbert's attempt to hurry away from Marine City was but partially successful as the motive power of his auto soon ceased to serve him.    Officers who, on notice of the affray, had gone in pursuit found him stalled by the roadside not far on his way and endeavoring to start his car.    They took him with his wife back to Marine City from where she then went

home by rail.   Hulbert secured his release the next day.    On the following Tuesday, September 12th, he called Robertson up by 'phone from the Detroit interurban station and, as he states, "told him that I had made a mistake and desired to rectify it and wanted to know if he would accept an apology."    He says, "Yes, but not over the telephone."    In answer to a request for an appointment Robertson replied, "any time that is convenient to you call at my office." This Robertson does not deny.    On the following day, September 13th, Hulbert went to Robertson's office, told him he felt he had wronged him, had come to apologize and to settle for what he had done.    Robertson related what was then said and done as follows:

"When Mr. Hulbert came in on the 14th (13th) he came in to apologize, the substance of it was, for the wrong he said he had done me and my family.    He came in there and he said that he unjustly wronged my wife and my family and myself for which he was sorry, and I said, 'Well, that is easy.'    I said 'You caused me too much trouble to get off that easy,' and he said, 'Will you accept my apology?' and I said, 'Why, I will accept your apology, yes.'    Well, he said, that he was sorry that he did it.    But I said, 'I have been disgraced here.'    Well, he said, 'What can I do?'    I said, 'what you can do now'—you see there had been no issue of my paper and people were talking this and I was walking around the back street to get to my office and I grabbed at the first straw to protect myself and I asked him if he would sign a public statement for publication to the effect that he had wronged me, he said he would, which he did and which I published.    I prepared the statement and that was published in the September 14th issue of my paper."

Hulbert's account of this interview is of like import and concludes:

"I signed the statement.    After the detraction was signed I asked him if there was anything else I could do, he said 'no, as far as I am concerned I am through with it, any action that will be taken against you in

the future will be done by the State authorities.' I didn't have any further talk with him.    I shook hands with him and wished him good luck and left his office."

This "statement," or "retraction," which defendant then signed was published by Robertson on the first page of his Marine City Independent in the September 14, 1922, issue under a large display title "To the Public," and reads as follows:

"This is to certify that I, Edward Hulbert, wrongly and unjustly caused William A. Robertson, and his family unfavorable publicity, and attacked Mr. Robertson without any cause whatever.    I am submitting this statement to the public to right the wrong that I have done these people.

"EDWARD L. HULBERT."

Plaintiff's amended declaration, filed April 3, 1923, makes prominent the abandoned feature of slander in stating the circumstances of the assault.    It charges that Hulbert "then and there made a vicious, slanderous, malicious and wholly untrue accusation as to plaintiff's character and there accused plaintiff of taking indecent liberties and having immoral relations with his, said Hulbert's wife    *    *    *    and with great force and violence knocked him down," etc. Assuming that Hulbert said on that occasion what the declaration alleges, but the proofs do not bear out, plaintiff states his ground of action in his concluding count as follows:

"That the above slanderous, malicious and wholly untrue accusation became of public knowledge and was widely circulated to plaintiff's great shame and loss of reputation; that plaintiff's character became greatly damaged by this scandalous rumor; that the public beating that plaintiff suffered at the hands of the said Edward Hulbert caused the said plaintiff to be put to great shame, mortification and degradation; that his business has suffered by the resultant disgrace inflicted upon the said plaintiff, as its owner; that plaintiff is now looked upon with suspicion as to his

morality and character by many citizens of the said city; that plaintiff was badly bruised and hurt as a result of the aforesaid assault and suffered the indignity of and shame of disfigurements for a short time after said assault; that the shame, mortification, and public disgrace that plaintiff was and is now subjected to have caused him and his family great mental anguish.

"That plaintiff has suffered through the wrong acts complained of injury to the amount of ten thousand dollars ($10,000)."

Plaintiff testified to no disfigurement or physical injury, except to his nerves, which he contended were shattered by the assault and publicity which followed. No medical testimony was offered as to any injuries, physical or mental. The only evidence as to any marks or signs of physical injury was by his assistant who had notified the officers of plaintiff's abduction, and testified:

"The minute he got Robertson out of the office I ran through the alley to see what might happen or take place on the back street and I saw the car with a lady in it. I didn't wait, I went back in and called an officer. I saw Mr. Robertson after he came back from Market street.

"*Q.* What was his condition?

"*A.* He was in a nervous wreck. I could see that he had been hit in the face. He was very nervous and high strung."

Two allegations of error strenuously urged for defendant are refusal to grant his motion for a continuance, and an application during the trial for leave to amend his plea of not guilty by adding special notice of probable cause "to believe the acts which he is alleged to have charged to plaintiff," and of accord and satisfaction based on plaintiff's acceptance of his signed statement, and apology, with assurance, in answer to defendant's inquiry, that he wanted nothing more.

The motion to amend was based on no new information but, as the court stated, on facts long familiar to defendant and his counsel, with ample time and opportunity to amend weeks prior to the time of trial. Under *Deline* v. *Insurance Co.*, 70 Mich. 435, its denial was within the court's discretion.   In any event it worked no prejudice to defendant, for the court permitted his counsel to go fully into the evidence on that subject, both on direct and cross-examination of witnesses, and submitted the same to the jury as proper for their consideration in mitigation of damages even to a nominal verdict of six cents, but correctly held that under the undisputed evidence and defendant's admissions it did not furnish a valid consideration for full accord and satisfaction.

The motion for continuance was based on the absence of a witness named Stanwitz, who Hulbert said he thought was a sailor, but whose whereabouts he was then unable to locate.   A continuance is universally recognized as discretionary with the trial court and only to be disturbed in case of a palpable abuse of discretion.   Hulbert claimed that he was moved to his activities against Robertson by what Stanwitz told him, he was permitted to relate what Stanwitz had told him as fully as he desired on his direct-examination, and urged on cross-examination to tell it all, in detail.   His revelations in that line would seem to afford plausibility for proceedings taken to inquire into his sanity, which he said he learned of afterwards.   On direct-examination he stated as his reason for assaulting plaintiff:

"A man came to me and told me there was a man visiting my house during my absence.   He was seen on my premises.   The man that told me was Joseph Stanwitz.   He afterwards told me that he thought it was Mr. Robertson.   On the day that I went into Robertson's office I did not believe that this was true. I did not think that there was any foundation to the tale at all.   I merely wanted to investigate it so that

if there was any scandal or rumor started to that effect so that Mr. Robertson and myself, his family and my family could protect ourselves."

On cross-examination he said:

"I have lived with my wife twenty-four or twenty-five years and I never had occasion to have any suspicion of her and on September 8th I did not suspect that she had been carrying on improperly with Mr. Robertson. * * * In my mind there was no suspicion of my wife's integrity. This man Joseph Stanwitz, I think, is a sailor. I cannot tell you where he is now. Stanwitz came to me and said that he had seen a man on my premises in my absence. That is all that caused me to investigate as I did. He told me later that the man was Mr. Robertson, the printer, of Marine City. Based upon this I took my wife up and did the things I have testified to on the stand. * * *

"*Q.* Why didn't you ask your wife about Mr. Robertson and why he was there?

"*A.* I didn't wish to humiliate her."

As submitted to the jury this is purely an action for assault and battery. It is undisputed that Hulbert assaulted and struck Robertson without any suggestion of provocation, beyond the former's statement that he had never seen Hulbert's wife before in his life. For such unwarranted assault the recognized elements of damage are actual physical injury and mental suffering, or sense of outrage and mortification from the humiliating indignity arising from the assault and blow so inflicted. The charge in plaintiff's declaration that defendant "then and there made a vicious, slanderous, malicious and wholly untrue accusation" as to plaintiff's conduct towards and with his (Hulbert's) wife, and of having had immoral relations with her is sustained by no evidence and negatived by plaintiff's own testimony as to what was said on that occasion. In fact the record is barren of any evidence that defendant ever made any such charges to or be-

fore any one, except in the private interview with plaintiff's wife when he solicited her aid in his detective project, of which she told her husband. When defendant compelled plaintiff to go with him he told him to keep still in avoidance of publicity, to which plaintiff replied, "I am not afraid of publicity, it is you."

Plaintiff's counsel stated at the trial that no claim for damages was made by reason of "any nervous condition," but for the humiliation and mental suffering plaintiff underwent as a result of the attack. To show the cause and intensity of such suffering, plaintiff was allowed to testify, against objection, without showing it emanated from defendant, that immediately after the assault it became generally known and was to him a humiliating subject of discussion in Marine City for several weeks, that *they* said

"where there was fire there must be some smoke. * * * They said I had been running around with Mr. Hulbert's wife and that was the reason for his cleaning up on me. * * * This conversation caused me worry and anxiety many nights, many sleepless nights and I could say I came down to my office I was a nervous wreck and I was afraid of this man, I was unable to attend to my business."

Several witnesses called by plaintiff were allowed to testify, against objection, as to its being a matter of common gossip in Marine City that Hulbert had assaulted Robertson because the latter had been intimate with Hulbert's wife, and to state opinions of third parties as to its truth without disclosing who the parties were or their source of information. As an example of that line of testimony, Mrs. Dora May who with her husband was in the meat business down town, testified that she heard of the assault two or three hours after it happened and continued to hear about it for some weeks. She was asked and answered further in part as follows:

"*Q.* What else did you learn in Marine City about this transaction?

"*A.* Why, it was general gossip.   Most every party that came in the store had something to say about it. And, as I say, there was some doubted it, and that some said 'where there is smoke there is fire.'   *   *   *

"*Q.* You say some said where there was smoke there was fire?

"*A.* Yes, sir.

"*Q.* Some didn't believe it?

"*A.* Some didn't believe it, some did, to my way of thinking.

"*Q.* From what you heard there was a difference of opinion as to Mr. Robertson's guilt or innocence?

"*A.* There was."

None of the witnesses produced testified to believing there was any truth in the gossip as to the cause of the assault and most of them said they did not believe it.   The effect of the testimony of those witnesses was to bring against defendant unsworn substantive evidence of prejudicial statements of unnamed third parties.

Plaintiff stated as his principal grievance and element of damages the publicity of defendant's charge of undue familiarity with the latter's wife, but fails to prove that the publicity emanated from defendant. The proof tends strongly to the contrary.   There were no witnesses to the assault except the parties themselves and Hulbert's wife.   When Hulbert took Robertson out to where his wife was he enjoined it upon him to keep still in avoidance of publicity, to which Robertson replied, "I am not afraid of publicity, it is you," and it apparently was, for Hulbert left town as quick as the affray was over, while the assault and reputed cause of it immediately became a matter of publicity and common gossip in Marine City.   When Hulbert left after committing the assault no one in Marine City knew even of the assault except Robertson, or of any reason Hulbert might entertain for

assaulting him except Robertson and his wife, so far as this record discloses.

Robertson was a publisher.   When Hulbert apologized to him and asked what he could do to make amends, the only thing Robertson asked for was a retraction or statement for publication.   Hulbert was willing to and did sign whatever he wanted and he published it six days after the assault, which apparently revived public interest as he states it continued to be a topic of public gossip for several weeks. The public records show and plaintiff admits that he began in the same month, and had pending contemporaneously, untried at the time of this trial, another action for assault and battery against a man named Guyor claiming $15,000 damages for the great pain, suffering, humiliation, mental distress and sorrow caused to himself and family by such assault.   He testified, however, that cause had nothing to do with the nervous condition and mental distress for which this action is brought, but does not make clear how he differentiated, unless by the proportions of his *ad damnum* clauses.   Neither did the numerous witnesses called in his behalf, who were allowed to testify, over objection, as to his shattered nervous condition, and inability to do as good work as before, continuing up to the time of the trial.   He testified, "I was actually unable to attend to my business."   From this a jury might include in their assessment of damages injury to plaintiff's business, as he had alleged in his declaration.

The following requests of defendant were refused:

"No evidence has been introduced to justify any recovery on account of injury to the plaintiff's business.   Therefore, you are instructed that you cannot give any damages for injury to the plaintiff's business or newspaper.   *   *   *

"Counsel for plaintiff has admitted in open court that no damages are claimed on account of any nervous

injury or condition.    Therefore all evidence intro-
duced tending to show such injury or condition is
stricken out of the case and you are instructed to dis-
regard it and award no damages therefor even if you
should find such nervous injury or condition."

Plaintiff alleged in his declaration damage to his
business and was permitted to introduce before the
jury testimony tending in that direction, but furnished
no proper proof upon which a jury could legally esti-
mate such damages.    Defendant was entitled to have
the jury instructed upon that subject as requested.

Plaintiff and certain of his witnesses featured in
their testimony his shattered nervous condition follow-
ing the affray extending even down to the time of the
trial.    His counsel stated during the trial when that
question was raised that no damages were claimed by
reason of any nervous condition.    Defendant was en-
titled to the second request quoted.

The record is convincing that the jury was misled as
to the true measure of damages and under the circum-
stances shown made an excessive award.    In assault
and battery the measure of damage is based on the
physical injury, resulting pain and attending mental
suffering occasioned by the unlawful personal assault
and blow struck.    The mental anguish which may be
taken into consideration, like the physical pain, is
limited to such as is suffered by the plaintiff in con-
sequence of the personal insult and injury inflicted
upon him in connection with the assault.

For the foregoing reasons the judgment is reversed,
with costs to defendant, and a new trial granted.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE,
FELLOWS, and WIEST, JJ., concurred.